UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

**DARA ARGRO, CODY BESS AND
MYRNA HORSHINSKI ,**

**Plaintiffs,**

**-v-**                                        3:12-CV-910 (NAM/DEP)

**BETTE OSBORNE, Individually and as CHENANGO
COUNTY, NEW YORK COMMISSIONER OF SOCIAL
SERVICES; CRYSTAL CORNELL, in her individual
capacity and in her capacity as a Social Worker for the
Department of Social Services, Chenango County, New
York; LACE-ANN PORTER, in her individual capacity
and in her capacity as a Social Worker for the Department
of Social Services, Chenango County, New York; LINDA
SMITH, in her individual capacity and in her capacity as a
Social Worker for the Department of Social Services,
Chenango County, New York; DEB MUNYAN, in her
individual capacity and in her capacity as a Social Worker
for the Department of Social Services, Chenango County,
New York; JESSICA SMARSMACH, in her individual
capacity and in her capacity as a Social Worker for the
Department of Social Services, Chenango County, New
York; KATHY LaVOIE, in her individual capacity and in
her capacity as a Social Worker for the Department of Social
Services, Chenango County, New York; KELLY O'CONNOR,
in her individual capacity and in her capacity as a Social
Worker for the Department of Social Services, Chenango
County, New York; DET. MARSH of Norwich City Police
Department, Chenango County, New York, in his official and
individual capacities; JOHN DOE, Chenango County Social
Worker, in his individual and official capacities; JANE DOE,
#1 through JANE DOE#2, Chenango County Officers
and employees, to be determined in discovery,**

**Defendants.**

◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

APPEARANCES:

Neroni Law Office
Tatiana Neroni, Esq.

203 Main Street
Delhi, New York 13753
Attorney for Plaintiffs

Levene, Gouldin & Thompson, LLP
Maria E. Lisi-Murray, Esq., of counsel
450 Plaza Drive
Vestal, New York 13850
and
Levene, Gouldin Law Firm
Erin E. Donnelly, Esq., of counsel
P.O. Box F-1706
Binghamton, New York 13902-0106
Attorneys for County Defendants

Shantz & Belkin
M. Randolph Belkin, Esq., of counsel
26 Century Hill Drive
Suite 202
Latham, New York 12110
Attorney for Defendant Det. Marsh

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## INTRODUCTION

In this action under 42 U.S.C. § 1983, plaintiffs claim, *inter alia*, that defendants searched their home on a number of occasions and threatened to arrest plaintiff Dara Argro, in violation of various Federal Constitutional rights. The following motions are pending: motion for summary judgment by defendant Detective Rodney Marsh (Dkt. No. 57); motion for summary judgment by all other named defendants ("County defendants") (Dkt. No. 64); and motion by plaintiffs to allow counsel to disclose confidential discovery materials to plaintiffs and a non-party (Dkt. No. 65). As set forth below, Detective Marsh's motion for summary judgment is granted in its entirety with prejudice; the County defendants' motion for summary judgment is granted in part and denied in part; and plaintiffs' motion regarding confidential discovery materials is granted to

the extent set forth herein.

**PRIOR MOTIONS**

On Detective Marsh's prior motion (Dkt. No. 6) to dismiss the initial complaint, this Court issued a decision (Dkt. No. 23) granting the motion to the extent it sought dismissal of the conspiracy claim and all section 1983 claims against him in his official capacity, and otherwise denied the motion. In the same decision, the Court granted the County defendants' dismissal motion (Dkt. No. 12) to the extent it sought dismissal of the conspiracy claim and the intentional infliction of emotional distress ("IIED") claims arising from events on June 17, 2010 and December 23, 2010, and otherwise denied the motion. The Court further permitted plaintiffs to amend and supplement their complaint.

**STANDARD ON SUMMARY JUDGMENT**

The party moving for summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the burden shifts to the non-movant to adduce evidence establishing the existence of an issue of material fact. *See Linares v. McLaughlin*, 423 Fed.Appx. 84, 86 (2d Cir. 2011). If the non-movant fails to make such a showing, the movant is entitled to summary judgment. When deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citation omitted). Conclusory statements or mere allegations, however, are not sufficient to defeat a summary judgment motion. *Id.* Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiff Myrna Horshinski was in her 80's at the time of the incidents alleged. She is the mother of twins, Diane Davis and plaintiff Dara Argro. At the times in issue, Myrna Horshinski owned a home in which she resided with Dara Argro, Diane Davis, Diane Davis' son plaintiff Cody Bess, and a child D.T., the son of another of Diane Davis' sons.

Burk Affidavit

In support of their motion, the County defendants rely in part on the affidavit of their expert, Margaret A. Burk, Esq., to the effect that, accepting defendants' version of events, defendants DSS caseworkers' conduct was proper. Burk states that it is her opinion that the caseworkers "properly investigated the Child Protective Services reports regarding the subject minor child and properly performed home visits to plaintiffs' residence in the course of their investigation"; that there is no evidence "that corroborate[s] the allegations of plaintiffs" that defendants "conducted an improper CPS investigation"; that "[i]n conducting the home visit as part of the investigation there is no requirement that a Court Order or warrant is to be obtained"; and that "[c]aseworkers are trained to request permission of the resident to enter the home by advising that an investigation has been commenced requiring a home visit." Burk further states that upon reviewing the record and the notes of the defendants caseworkers, there is no evidence: a) that threats were made to Horshinski regarding placing her in a nursing home; b) that Horshinski was in her bed or the bathroom at the time of any home visit; c) that a search of plaintiffs' underwear drawers was conducted; d) that medications were removed from their

-4-

bottles; e) that physical altercations with any of the plaintiffs occurred; f) that defendants caseworkers demanded or forced their way into a locked room; or g) that attempts to coerce Argro to make false statements occurred. Burk states: "It is within a reasonable degree of certainty, based on the defendant caseworkers' visits notes and recollections, that a proper investigation was conducted by the Chenango County Defendants, and there is no independent proof outside the allegations of plaintiffs that the investigation of the subject minor child by the Department of Social Services, Chenango County was improper." Burk's affidavit is based on the assumption that the questions of fact are resolved in defendants' favor, and thus does not support an award of summary judgment.

First Cause of Action

The first cause of action of the second amended complaint states a claim by Myrna Horshinski and Cody Bess against Chenango County ("County") and DSS caseworkers Linda Smith and Deb Munyan.[1] Horshinski and Bess allege that on June 17, 2010, Smith and Munyan came to the home without a search warrant or court order and searched the residence, including bedrooms and bureau drawers, without permission and despite the protests of plaintiff Dara Argro, who was present during the search; that Smith and Munyan stated they had a right to search because that was the "protocol" – apparently referring to a DSS policy; that Smith "hinted to" Horshinski that she could "arrange" to have her placed in a nursing home, thus causing Horshinski great distress; and that this conduct violated the privacy rights of Horshinski and Bess and their protection against unreasonable searches and seizures, citing the Fourth, Fifth, and

_____

[1] The caption of the second amended complaint does not name Chenango County Department of Social Services as a defendant, although plaintiffs name it as a defendant in the heading to the first cause of action. The Chenango County Department of Social Services is not a proper defendant, and any claim against it is dismissed.

Fourteenth Amendments.

Essentially, this cause of action states a claim under the Fourth Amendments' prohibition of unreasonable searches, made applicable to the states by the Fourteenth Amendment. "Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 587 (1980) (citation omitted). Plaintiffs also cite the Fifth Amendment, presumably intending to state a substantive due process claim. The claim is, however, properly analyzed under the Fourth Amendment, and not as a substantive due process claim. *See United States v. Lanier*, 520 U.S. 259, 272, n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth... Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (citation and internal quotation marks omitted)). Therefore, to the extent that the first cause of action of the second amended complaint asserts a substantive due process claim, it is dismissed.[2]

In support of their motion for summary judgment, defendants rely on the affidavit of Deb Munyan stating that she did not go to or search the home on June 17, 2010. Munyan further states that on June 22, 2010, she and Linda Smith conducted a home visit; that Myrna Horshinski, Diane Davis, and Dara Argro were present; that at no time did any plaintiff refuse to allow them to enter or request them to leave; that while at the home on June 22, 2010, Munyan and Smith

---

[2] Any purported claim under the Ninth Amendment is also dismissed.

spoke with Davis and Argro about allegations in a Child Protective Services ("CPS") report concerning D.T.; that Munyan and Smith did not search the bedrooms and dresser drawers of Horshinski or Bess; and that she never witnessed Smith threaten to place Horshinski in a nursing home. She does not allege that they had a court order or warrant or that exigent circumstances existed.

The deposition testimony of Myrna Horshinski, Dara Argro, and Cody Bess is sufficient to raise material questions of fact on the issues of whether Smith and Munyan entered the home without permission or other justification; whether Smith obtained Horshinski's permission to enter and search by threatening to place her in a nursing home; and whether they searched Horshinski's and Bess's bedrooms and bureau drawers.

Resolving all ambiguities and drawing all factual inferences in favor of plaintiffs, the Court denies summary judgment dismissing the first cause of action against Smith and Munyan. The Court also allows the claims against the County to remain, as discussed below in connection with the sixth cause of action.

Second Cause of Action

The second cause of action, by Myrna Horshinski and Cody Bess against a DSS caseworker Jessica Szarmach (incorrectly sued as Jessica Smarsmach) and John Doe, claims that between December 14 and December 23, 2010, Szarmach and John Doe entered the home without consent, exigent circumstances, a court order, or a warrant; "burst" into Myrna Horshinski's bedroom where she was resting in bed; searched Horshinski's medicine bottles by opening them, removing all the pills and counting them; and searched Horshinski's drawers, despite the protests of Horshinski and Argro.

In support of their summary judgment motion, defendants rely on the affidavit of Jessica Szarmach stating that on December 16, 2010 she received a telephone call from Diane Davis requesting a home visit; that in response to the request, Szarmach made a home visit to the residence to investigate a Child Protective Services report which required a safety assessment at the home where D.T. resided; that on that date Diane Davis and Dara Argro did not refuse permission to enter but rather let her into the home and agreed to show her around; that Myrna Horshinski was not in bed during the visit; and that there was no search of any pill bottles or dresser drawers. She does not allege that they had a court order or warrant or that exigent circumstances existed.

As with the first cause of action, to the extent that the second amended complaint asserts a substantive due process claim, it is dismissed. The deposition testimony of Myrna Horshinski and Dara Argro is sufficient to raise a question of fact on the issues of whether Diane Davis requested the visit and whether Szarmach entered the home and searched Horshinski's bedroom, pill bottles, and bureau drawers without permission in violation of the Fourth Amendment. Resolving all ambiguities and drawing all factual inferences in favor of plaintiffs, the Court denies summary judgment dismissing the second cause of action against Szarmach under the Fourth Amendment. The claim against John Doe is dismissed without prejudice.

Third Cause of Action

The third cause of action, on behalf of all three plaintiffs, is asserted against DSS caseworkers Crystal Cornell and Lace-Ann Porter. Plaintiffs claim that in December 2010, Cornell and Porter searched the house without consent, exigency, a court order, or a warrant; that they advanced towards the bathroom where Horshinski was showering; that when Dara Argro

protested, Porter pushed Argro against a washing machine, causing bruising; and that Porter then "burst into the shower" and searched the bathroom. The second amended complaint also claims that Cody Bess had installed a padlock on his bedroom door, prohibited entry into his bedroom, left a key available, and instructed his family members to use the key only in case of fire; that Argro informed Cornell and Porter of Bess' instructions; and that Porter grabbed the key, opened the padlock, and proceeded to search the room thoroughly, including looking under the mattress and in the bureau drawers. At the time of the search, Porter and Cornell allegedly stated that the non-consensual search of the entire house, bedrooms, and personal effects of all inhabitants was part of the agency's "protocol." Porter allegedly added that "her government job has absolutely no responsibility and no accountability to the general public whatsoever, and that's what makes it such a great job."

All plaintiffs claim infringement of their rights to privacy and protection against unreasonable search. As stated above, such claims are Fourth Amendment claims. With respect to Dara Argro's claim that Porter pushed her against the washing machine, causing a bruise, the law is that where, as here, the plaintiff does not assert that she was arrested or seized, her claim for excessive force falls outside the Fourth Amendment and instead is governed by the Due Process Clause of the Fourteenth Amendment. *See Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998) ("[O]utside the context of an arrest, a plaintiff may make claims of excessive force under § 1983 under the Due Process Clause of the Fourteenth Amendment."); *Tierney v. Davidson*, 133 F.3d 189, 199 (2d Cir. 1998) (same). To determine whether the use of force violated the plaintiff's due process rights, the Court must determine whether the force used "shocks the conscience" by considering the following factors: "[1] the need for the application of force, [2]

the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Tierney*, 133 F.3d at 199 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (brackets in *Tierney*)). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987); *accord Piper v. City of Elmira*, 12 F.Supp.3d 577, 587-89 (W.D.N.Y. 2014).

In support of their motions for summary judgment, defendants submit the affidavit of Crystal Cornell stating that she was not at plaintiffs' residence in December 2010. She stated that on March 23, 2011, Diane Davis telephoned her requesting that a caseworker come to the home to meet with her and D.T.; that on March 28, 2011, Dara Argro telephoned her requesting that a caseworker meet with Cody Bess; that on March 29, 2011, Cornell conducted a home visit at the residence; that she was granted permission to enter for the requested meeting; and that at no time during the visit was she asked to leave the premises.

Defendants also submit the affidavit of Lace-Ann Porter, stating that in December 2010 she was not present at the residence, she did not search the house, she did not enter the home, she was not in the vicinity of the home, and she did not conduct a home visit.

In opposition to the motion, plaintiffs rely on the deposition testimony of Dara Argro, who stated that Porter came to her house only once, though she was not sure of the date; that during the incident in question, Cornell and Porter entered without permission; that when Argro told them to leave, they said they could not leave because they had to investigate; that Porter then stated: "I love my government job, because ... I have no responsibility to the general public or

-10-

accountability"; that when they started towards door to the first-floor bathroom, Argro attempted to block them; that Porter then "shoved [her] to the right, not very hard" causing her to bump into the washing machine; that Cornell then ran into the bathroom; that Argro heard Horshinski yelling "get out"; and that Porter and Cornell then went upstairs, searched the bedrooms, and, using Bess' key which was hanging by the door, thoroughly searched his room despite Argro's protests. Horshinski testified that it was Porter who entered the bathroom and looked into the shower, and that Horshinski told her to "get out of here."

The deposition testimony of Argro and Horshinski is sufficient to raise material questions of fact regarding whether Porter and Cornell conducted a search without consent, exigency, a court order, or a warrant, including entering the bathroom and Cody Bess's locked room. Therefore, plaintiffs' claims for unreasonable search under the Fourth Amendment withstand summary judgment.

Considering the *Tierney* factors, the Court also finds that Dara Argro's testimony is sufficient to raise a question of fact regarding whether Porter used excessive force by pushing Argro against the washing machine. Accepting the truth of plaintiffs' allegations for purposes of this motion, the Court cannot hold as a matter of law that there was a need for the application of force, that the amount of force used was appropriate in view of the need, and that the force was applied in a good faith effort to maintain or restore order. Thus, the third cause of action presents a substantive due process claim of excessive force sufficient to resist summary judgment.

The Court recognizes that as a result of plaintiffs' apparent error regarding the date of the alleged incident, which plaintiffs now claim occurred in July 2011 instead of December 2010, the affidavits of Crystal Cornell and Lace-Ann Porter are directed towards the wrong date.

-11-

Defendants argue that they "have been denied the opportunity during discovery to search their files and obtain pertinent records relative to the new alleged date"; "have been denied the opportunity to properly investigate plaintiffs' claims with respect to the 'new date'"; and have been "denied the opportunity to properly oppose plaintiffs' claims in the present motion."  The County defendants do not explain how they would have conducted discovery differently if they had known the correct date.  Their affidavits in support of the summary judgment motion are based solely on their own records, and, even if their affidavits set forth denials and averments directed towards July 2011 instead of December 2010, such affidavits would not warrant an award of summary judgment dismissing the claims against them, because plaintiffs' allegations raise material questions of fact.  In addition, their attorney thoroughly cross-examined plaintiffs regarding the incident, and indeed at one point Dara Argro stated that she thought the incident occurred in the summer, not the winter.  On this record, the Court does not find that the error caused prejudice to the County defendants that would warrant dismissal of the cause of action.  Summary judgment dismissing this cause of action is denied.

Fourth Cause of Action

Myrna Horshinski and Cody Bess assert the fourth cause of action against Jane Doe #1 and Jane Doe #2.  The cause of action alleges that in September 2011 the Jane Doe defendants "attempted to search the house, which attempt was denied to them, and then went on to search Cody Bess' vehicle without his consent and over a direct prohibition not to do that."  No one was able to identify the Jane Doe defendants in their depositions.  This cause of action is dismissed in its entirety without prejudice.

Fifth Cause of Action

In the fifth cause of action, Dara Argro asserts various federal constitutional violations and a state law IIED claim against Detective Marsh and DSS caseworkers Kathy LaVoie and Kelly O'Connor. The second amended complaint alleges that in December 2011, "Detective Rodney Marsh, acting under the color of state law, together with Social Workers Kelly O'Connor and Kathy LaVoie, attempted to coerce Dara Argro to make a false incriminating statement against her identical twin sister with whom Defendant Marsh knew Dara Argro resided together and was very close, and threatening that if Dara Argro refuses to do so, she will go to jail." The second amended complaint continues: "When making his threats Detective Marsh, as well as Defendants O'Connor and LaVoie were aware that they were trying to elicit from Dara Argro a false statement against ... [Diane Davis.]"

In support of their motion for summary judgment, defendants submit the affidavit of Kathy LaVoie stating that in December 2011, she did not have any conversation with Dara Argro; that she did not have or witness any conversation with Argro and Detective Marsh or Kelly O'Connor in which they were attempting to coerce Argro to make false incriminating statements in lieu of going to jail; and that at no time has she ever had conversations with Detective Marsh or Kelly O'Connor that involved threats to incarcerate Argro for refusing to sign papers that involved Diane Davis.

Defendants also submit the affidavit of Kelly O'Connor, stating that in or about December 2011 she did not have any conversation with Dara Argro; that in December 2011 she did not witness a conversation between Argro, Detective Marsh and/or Kathy LaVoie in which they attempted to coerce Argro to make false incriminating statements in lieu of going to jail; that she did not at any time submit any papers to Argro for her signature that set forth allegations against

-13-

Diane Davis; and that she did not at any time have any conversations with Detective Marsh regarding Argro or Davis that involved threatening to incarcerate Argro for refusing to sign a document.

Regarding this incident, Dara Argro testified in her deposition by counsel for the County defendants:

> A. But, Kelly O'Connor and well, the whole CPS wanted to take [D.T.] from Diane and give him to his father, his biological father. And they kept trying to find reasons, searching, trying to find things that they could use against Diane to take [D.T.]. And Kelly O'Connor told my sister, Diane, in front of me that she saw Detective Marsh, and she's going to be arrested, that Detective Marsh was going to call her. We didn't know whether they were just telling, you know, one of their fibs again or not. So, we didn't really take much to heart about it. Diane went and saw [D.T.]. That's when she had weekly visits at the County Office Building. And I'd drop her off and I would pick her up.... So, after that visit, that Kathy LaVoie came to me in the parking lot holding papers, and all I saw on that paper was Diane did not feed – I forgot how it went now properly – something about she didn't feed him or clothe him, in a sophisticated way of writing, and something else, that she beats him, in a sophisticated way, like she was, didn't say beat but it had, what it meant was she didn't feed him, clothe him and she beat him. I wasn't going to sign it. So, Kathy LaVoie says "you're sister's going to jail and you're going to jail if you don't sign this". I said "I'm not signing anything" and I left. Then the next day at one o'clock in the afternoon, I remember what time it was, guess who called the house? Detective Marsh.
> Q. Okay.
> A. Told Diane – oh, no, I don't know if it was one – told Diane she had a one o'clock appointment to see him. Anyway, he made an appointment for Diane to see him. I knew I was going because ... Detective Marsh called and told Diane she had to be there. I was shaking in my boots. I know it, because Kathy LaVoie said if I didn't sign it I'd be going to jail. And Detective Marsh called. I was so upset. ... So, I still to this day don't know whether Detective Marsh was going to put us in jail if Diane went down there or if he wasn't. I think he was in the middle of CPS trying to scare us into signing papers. I don't know, I just feel bad for Detective Marsh. He got in this for, I don't know what his part was, but he never threatened me. He never said anything about a confession to me. That was Kathy LaVoie. But Detective Marsh did call and that's when we were afraid to come down there. And we never came and he never came and never arrested us. We never called and canceled and we never showed up.

\*\*\*

Q. Was anyone else with Kathy LaVoie when this conversation with her occurred?

A. I was leaving this way (indicating). She was behind me with the papers in my face. I don't know if somebody was with her or not.

\*\*\*

Q. Okay. So, the only person you had a conversation with directly about this alleged statement at the County Office Building was Kathy LaVoie?

A. I think Kathy LaVoie admitted that she wanted me to sign that, didn't she, somewhere? I think she did.

\*\*\*

Q. All right. So, Kelly O'Connor had nothing to do with this incident?

A. Kelly O'Connor is the one that saw Detective Marsh to get Diane in there. I don't know why, what she said to get her in there. But Kelly O'Connor told Diane in front of me if she doesn't do something or -- anyway, that Detective Marsh was going to call her, or arrest her, going jail. I don't know exactly. I take everything back. What they told Diane I wasn't – that was hearsay that Diane told me and I don't know. But what Kathy LaVoie told me was "your sister is going to jail".

Q. Okay. With respect to – so, now you're telling me you take it back; the conversations that anyone had with your sister with respect to going to jail you had no direct knowledge of, you did not overhear?

A. No, what I heard, when I went in the building Kathy LaVoie, Kelly O'Connor was with [D.T.] when Diane was on the supervised visit with [D.T.]. I was out, I was not there yet. When I came back to pick Diane up, Diane was still in there and that's when, when I was walking in that's when she came running out with that paper in her hand saying "Diane's going to jail and you're going to jail too".

Q. When you say she, this is –

A. Kathy LaVoie.

Q. – Kathy LaVoie?

A. She's the only one that threatened me. I don't know of anybody who was with her because I didn't turn around to look.

Q. Okay. So, to the best of your understanding, the only one that threatened you with this false statement was Kathy LaVoie?

A. Yeah, but Kelly O'Connor said the Detective was going to call, was going to arrest us.

Q. And she said that to you personally?

A. No, she told that to Diane.

Q. But you weren't there for that –

A. No.

Q. – conversation?

A. No.

Q. So you don't know that directly?

A. But I know that Kathy LaVoie –

Q. You don't know that directly?

A. What I know directly is Kelly O'Connor saw Detective Marsh.

Q. Okay.

A. That's what I know directly.

Q. All right.

A. I know that, because she said it.

Q. But you weren't present for the conversations between your sister and Kelly O'Connor?

A. Diane told me Kelly O'Connor told her she's going to Detective Marsh to get her arrested.

Q. I understand that. But you weren't present between any conversations between your sister and Kelly O'Connor?

A. No, but after Kelly O'Connor told that to Diane Kathy LaVoie told me the same thing, that I'm going to jail if I don't sign it, and about Detective Marsh. So, guess what, Detective Marsh called. What Kelly O'Connor and Kathy LaVoie said, I guess, was true.

***

Q. That's fine. But at some point thereafter though you left the County Office Building parking lot and went home?

A. Yeah.

Q. Okay, and then when you're at home is when you received, or someone in your household received a phone call that you think was from Detective Marsh?

A. It was from Detective Marsh.

Q. Okay.  Who receives that call?

A. I did.

Q. Okay.

A. I picked up the phone.

Q. And just tell me what that conversation consisted of?

A. Detective Marsh, I believe, said that he had talked to Kelly O'Connor and that Diane needs to be there, I think, at one o'clock the next day.

Q.  Diane needs to be where?

A. At the police station.

Q. Okay.

A. At the City police station at one o'clock. I believe it was one o'clock the next day.

Q. Okay. Did they tell you what that was for?

***

A. He would not say.  I asked him.

***

Q. And did he say you had to be there at one o'clock or just your sister?

A. They mentioned my sister Diane but Kelly, Kathy LaVoie told me I was going to jail too.

Q. No. I know that. I just want to stay on the conversation. Detective Marsh told you on the phone that Diane needed to be at the City Police Department at one p.m. the next day?

A. Yes.

Q. Did he tell you you needed to be there the next day?

A. No. ....

Q. Okay, and did that conclude your conversation with him?

A. Yeah, that was it.

\*\*\*

A. But we never heard from him either, up to today. I still haven't heard from Detective Marsh.

When deposed by counsel for Detective Marsh, Dara Argro testified:

Q. Other than that one phone call that you said when he called your house –

A. Yes.

Q. – have you ever had any other contact with Detective Marsh?

A. No. ...

\*\*\*

Q. Well, Kathy LaVoie is the one that came out of the building with the papers, right?

A. Yeah.

Q. She said "Detective Marsh will be calling you"?

A. She said they were going to jail, but – I'm trying to do this right. They told Diane that Kelly O'Connor saw Detective Marsh about Diane. Diane told me that before, you know, I saw her that day. But then Kathy LaVoie came out with paperwork for me to sign saying if I don't sign it I'm going to jail too. So –

Q. So, at some point had you ever heard of Detective Marsh's name before?

A. Never in my life.

Q. Before Kathy LaVoie mentioned it?

A. Never before in my whole entire life.

\*\*\*

Q. And what happened next [after Dara Argro refused to sign the papers and Kathy LaVoie left]?

A. Then Diane came out. After a little while Diane came out and Diane told me that Kelly O'Connor saw Detective Marsh and said that I'm going to jail. I told her "they said I'm going to jail too". I said "because I didn't sign the paperwork"....

Q. So, when Diane came out this is when she mentioned that about Kelly O'Connor saying Detective Marsh?

A. Yeah, I think so. I think that's after she came out. I'm trying to piece it together. It happened so quick and it happened so long ago. All I know is Detective Marsh definitely called that house and told Diane she had to be

there at one o'clock.

Q. After Diane came out the two of you got in the car and then –

A. I told her what happened about the paperwork.

Q. Right.

A. And Diane mentioned something about the, I think she told me about Detective Marsh, about Kelly O'Connor. I don't know how it all went together, but this is how this went. Kelly O'Connor went to Detective Marsh, said something about Diane. Kathy LaVoie came to me to sign those papers, those false statements, or I would be going to jail. We didn't think much of it because they've threatened us before. We came home.

\*\*\*

Q. And how long were you home before you got this phone call?

A. I think it was like an hour, maybe half an hour. ...

\*\*\*

A. I answered the phone.

Q. What's the voice on the other end say? ...

A. I said "hello" and he said "this is Detective Marsh calling from the Norwich City Police Department".

\*\*\*

Q. What else was said?

A. He asked if Diane was there. ... She wasn't there when the phone call came.

\*\*\*

Q. Okay. So, this person asks for Diane and then your response was?

A. "She's not here right now".

Q. Okay, and then what was the next thing that was said?

A. Well, "tell her that she needs to come down to the City police station at one o'clock" to see him, you know, Detective Marsh, the next day.

\*\*\*

Q. What else was said in that phone conversation?

A. I said "what's it about". He said he talked to Kelly O'Connor, but he wouldn't disclose what the conversation, what the problem was. He wouldn't discuss it. Diane had to be there she said.

Q. You asked "what's it about"? He said "I have spoken to Kelly O'Connor"?

A. No. When I said "did Kelly O'Connor speak with you", he said "I can't disclose any" – because we already knew that Kelly O'Connor talked to him. So, I said "did Kelly O'Connor talk to you?" He said "I can't disclose any information, but Diane needs to see me at one o'clock".

Q. So, you asked this person, essentially, "what's this about, did you speak to Kelly O'Connor"?

A. Yes. I said, I said "Kelly O'Connor spoke to you because that's what we were told". I said "Kelly O'Connor spoke to you, right? Is it about what Kelly O'Connor told you", something like that I told him. I wanted to know what Kelly O'Connor said, why Diane was being arrested, and he wouldn't disclose that information.

-18-

Q. Okay. What was said next?

A. Nothing. I said "I'll tell her".

Q. Okay.

A. And I hung up.

Q. How long was the conversation?

A. Oh, not long. A minute, maybe less.

Q. Did the person on the other end of the phone threaten to arrest you?

A. No.

Q. Did the person on the other end of the phone threaten to put you in jail?

A. No. Kathy LaVoie did.

Q. And did the person on the other end of the phone say that you had to be there at one o'clock in the afternoon that next day?

A. No, but Kathy LaVoie said I was being arrested too.

\*\*\*

Q. And you were never arrested?

A. Never.

\*\*\*

Q. And you've had no further contact with Detective Marsh other than this one phone call?

A. Yeah, I never met the man. All I know is Kelly O'Connor told him to call, I guess. I don't know what, that's speculation. I don't want to speculate. But, I do speculate that Kelly O'Connor went to Detective Marsh, probably wanted Detective Marsh maybe to scare Diane into signing papers like Kathy LaVoie did to me, you know. I don't know what the problem, I don't know why Detective Marsh, why CPS went to him. I still don't know. And I don't know what that one o'clock thing was all about.

When Dara Argro's deposition testimony is stripped of speculation, it is evident that her cause of action is based solely on what Kathy LaVoie allegedly said to her in the parking lot. With respect to Detective Marsh and Kelly O'Connor, there is no claim that they were present in the parking lot, nor did Argro hear them make any statements at any time regarding the alleged matter to Kathy LaVoie or anyone else. Detective Marsh's alleged telephone call to the home later the same day, during which he merely asked to speak to Davis and requested that Davis come see him the next day, does not aid Argro in stating a cognizable claim. Dara Argro's deposition testimony does not support a claim against Detective Marsh or Kelly O'Connor.

As for her claim against Kathy LaVoie, Dara Argro alleges only that LaVoie approached

her in the parking lot and told her she could be arrested if she did not sign a statement against Davis. LaVoie did not threaten to arrest Argro on the spot; indeed, Argro knew that LaVoie was a DSS caseworker, not a police officer. Argro did not sign the statement. Rather, she simply walked away and went home. Neither Argro nor Davis was arrested by Detective Marsh or anyone else. This brief encounter is the only such incident alleged. Thus, there is no coerced statement, no consequence for refusing to sign, no detention, no lengthy or repeated incidents, no public humiliation or defamation, and no other basis to find a Constitutional violation.

In opposition to the motion, plaintiffs submit the affidavit of Diane Davis stating as follows:

> 25. In December of 2011 I came to the County Building to visit with my grandson [D.T.] according to the schedule of visitation.
> 26. There I was not given visitation, but I was searched and interrogated.
> 27. I was interrogated at that time by Kelly O'Connor and Kathy Lavoie.
> 28. Kelly O'Connor told me that she was going to see Detective Marsh about me and that I was going to jail.
> 29. Both Kelly O'Connor and Kathy Lavoie tried to make me admit that I did not provide proper clothing, care or food to my grandson.
> 30. I denied it because it was not true.
> 31. At some point during interrogation Kathy Lavoie left the room, while Kelly O'Connor remained.
> 32. Later on my sister Dara told me that Kathy Lavoie confronted her in the parking lot and tried to have her sign a statement against me about the same issues, that I did not provide proper clothing, food or care to my grandson.
> 33. The next day after I got home, the phone rang and it was Detective Marsh.
> 34. My sister Dara told me before that Detective Marsh called earlier.
> 35. Detective Marsh told me that Kelly O'Connor talked with him and he needs to see me down at the police station.
> 36. I asked whether I was going to be arrested if I come, and Detective Marsh did not give me a "yes" or "no" and simply told me to come.

Even accepted as true, Diane Davis' allegations do not add anything to Argro's claim. Assuming for the sake of argument that they support a claim by Davis, she is not a party.

Also in opposition to Detective Marsh's summary judgment motion, Dara Argro submits

-20-

an affidavit stating:

> 3.  The deposition of April 3, 2014 was one-sided, only the Defendants' attorneys were asking questions, and my attorney did not have an opportunity to ask me questions and bring out the details that I am putting into this affidavit.
>
> 4. I was not allowed to elaborate if questions covering additional details were not asked.
>
> 5. When social worker Kathy Lavoie tried to coerce me to sign papers against my twin sister Diane, she said that social worker Kelly O'Connor saw detective Marsh and that Diane is going to jail, and that if I do not sign the paperwork against her, I will be going to jail, too.
>
> 6. I understood that there was at that point an agreement between the social services and Detective Marsh and the Norwich City Police Department to put my twin sister Diane in jail anyway, and that I was going to be put in jail by Detective Marsh and social services unless I sign the paper they were insisting that I should sign.
>
> 7. When Defendant Marsh called me the next day after that conversation, no matter what he said, I perceived it as a threat and as a follow-up on my conversation with CPS, and I [became ill].
>
> ***
>
> 16. When Kathy Lavoie told me that I will be going to jail unless I sign incriminating papers against Diane, while I knew that the Norwich City Police already started investigation against Diane, and already interrogated her, it appeared very real to me.
>
> 17. I was scared because of the ongoing police investigation against Diane where I was present at her interrogation, and now I was directly threatened when Kathy Lavoie told me that social worker Kelly O'Connor, a Co-Defendant herein, already talked to Detective Marsh, and I believed that they already reached the agreement to pursue me and put me in jail, as Kathy Lavoie claimed.
>
> 18. When Detective Marsh called the next day and invited Diane to the police station, the same way she was invited previously, Detective Marsh knew or should have known that I accompany her everywhere.
>
> 19. Moreover, Detective Marsh asked specifically whether I was going to be bringing Diane and was going to be present.
>
> 20. I had a real ground to fear that the "invitation" was to carry out the threat and put both of us in jail, me for refusing to falsely incriminate my sister, as Kathy Lavoie stated to me it will happen because of what Kelly O'Connor told her after her conversation with Detective Marsh.

This attempt to salvage Argro's claim is unavailing.  It adds only that, while the two were

in the parking lot, LaVoie told Argro that "Kelly O'Connor saw Detective Marsh and that Diane

is going to jail, and that if I do not sign the paperwork against her, I will be going to jail, too."

Inasmuch as Argro – who knew LaVoie was a DSS caseworker and not a police officer – did not

sign, simply walked away, and was not seized, the Court finds no First or Fourth Amendment

violation. Nor is there a substantive due process claim; this single brief incident falls far short of

satisfying the "shocks the conscience" standard. *Rochin v. California*, 342 U.S. 165, 172 (1952).

In addition, any state law claim for IIED also fails. Kathy LaVoie's alleged statements do not

meet the "high threshold for conduct that is 'extreme and outrageous' enough to constitute

intentional infliction of emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790–91 (2d

Cir. 1996).

The Court adds that, to the extent that the allegations in Dara Argro's affidavit differ from

her deposition testimony and may be more favorable to her, it is well established in this circuit

that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary

judgment motion that, by omission or addition, contradicts the affiant's previous deposition

testimony." *Kennedy v. City of New York*, 570 Fed.Appx. 83, 84-85 (2d Cir. 2014). Argro

attempts to "explain away" her deposition testimony by stating in her affidavit that she was

"extremely upset at the time of the deposition" due to the medical condition of her mother Myrna

Horshinski, who had already been deposed the same day. Argro states that defendants' attorneys

refused to conduct the deposition at a location near their home; that plaintiffs had to pay for

medical transport; and that the deposition was "an extreme physical hardship on [her] mother."

Myrna Horshinski also submits a statement in opposition to summary judgment setting forth her

medical condition, the difficulty of making the trip to the location of the deposition, and her pain

and confusion during the deposition. These allegations do not warrant disregarding the portions

of Dara Argro's deposition that do not favor plaintiffs. Specifically with respect to the location of the deposition, the record shows that plaintiffs' attorney had requested (Dkt. No. 44) that the depositions of plaintiffs be held in Oxford, New York. Magistrate Judge Peebles issued a Text Scheduling Notice (Dkt. No. 45) scheduling a telephone conference on January 22, 2014 to address this and other issues. The Text Minute Entry (Dkt. No. 46) for the January 22, 2014 telephone conference shows that plaintiffs' counsel failed to appear and had not made a request to be excused from the telephone conference; that plaintiffs' depositions were scheduled to occur in Binghamton, New York; that Magistrate Judge Peebles scheduled another telephone conference for February 6, 2014; and that he "admonished [plaintiffs' counsel] that failing to appear for future conferences could possibly result in the issuance of sanctions." By email to Magistrate Judge Peebles' chambers on January 23, 2014 (Dkt. No. 47) plaintiffs' counsel requested that the admonishment be vacated and that the February 6, 2014 telephone conference be adjourned, but did not request a change in the location of the depositions. By Text Order the same day (Dkt. No. 48) Magistrate Judge Peebles denied the request to withdraw the admonishment and granted the request to adjourn the telephone conference. On January 24, 2014 (Dkt. No. 51) plaintiffs' attorney requested reconsideration of the denial of vacatur of the admonishment; again she did not request a change in the location of the depositions. On the same day (Dkt. No. 52) Magistrate Judge Peebles denied the reconsideration request. Plaintiffs' attorney did not appeal to this Court. On this record, plaintiffs cannot complain of the location of the depositions. Moreover, a review of the deposition transcripts reflects that plaintiffs' attorney was present throughout the depositions and that numerous breaks were taken. In addition, with respect to Myrna Horshinski, the Court does not rely on her deposition with respect to any rulings against plaintiffs on this

motion, nor does Horshinski set forth anything in her affidavit that contradicts her deposition testimony in any significant manner. The Court rejects plaintiffs' attorney's opinion that the deposition testimony given by Dara Argro and Myrna Horshinski "may be considered invalid."

There is no evidence upon which a rational trier of fact could find for Argro on the fifth cause of action. The fifth cause of action is dismissed.

Sixth Cause of Action

All three plaintiffs assert the sixth cause of action against the Chenango County Commissioner of Social Services, Bette Osborne, in both her individual and official capacities. The second amended complaint claims that at the times in issue, Bette Osborne was a policy maker; that she "knew that [DSS] employees are routinely entering people's homes and conducting searches"; that she failed to establish "proper training policies of her personnel regarding individual's constitutional right against self-incrimination, coercion, as well as constitutional right to privacy, including but not limited to privacy in individual's person, personal effects and documents, vehicles and homes and against unreasonable search and seizure"; and that she established an unwritten policy or "protocol" pursuant to which DSS employees "were allowed to enter anybody's home without a search warrant or court order and without care for protestations of privacy and objections to searches, and do whatever they like."

In moving for summary judgment, Bette Osborne submits an affidavit stating:

> 3. At all times relevant, my duties were in a supervisory capacity of the named defendant caseworkers.
> 4. At no time did I have personal involvement or contact with any of the named plaintiffs.
> 5. I did not participate directly with the numerous investigations that were commenced as a result of Child Protective Services reports made.
> 6. I did not create the policies in which defendant caseworkers adhered to in conducting their investigations in response to Child Protective Services

reports made.

7. At all times relevant, I am not aware of any improper investigations performed by defendant caseworkers with respect to the Child Protective Services reports involving plaintiffs.

8. I was not apprised of any violation as a result of improper investigation by the named defendant caseworkers through a report or verbal acknowledgment.

9. At all times relevant, I never personally made a home visit to the residence of plaintiffs, nor was involved in any conferences or meetings with regard to the progress of plaintiffs' case or fielded any phone calls from plaintiffs or involving plaintiffs' case.

The Court first addresses plaintiffs' claims against Bette Osborne in her individual capacity. It is well established that "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). To recover against a government-official defendant, the plaintiff must show that each official, "through the official's own individual actions, has violated the Constitution." *Id.*

The Second Circuit's formulation in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), has long been the law in the Second Circuit regarding supervisory liability. *Colon* held that personal involvement of a supervisory defendant may be shown by evidence that he or she: (1) participated directly in the alleged constitutional violation, (2) failed to remedy a violation after learning of it through a report or appeal, (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such policy or custom, (4) was grossly negligent in managing subordinates who committed constitutional violations, or (5) exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. *See Colon*, 58 F.3d at 873. The impact on *Colon* of the Supreme Court's decision in *Iqbal* is still an open question in this circuit. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's

personal involvement with respect to certain constitutional violations," but declining to reach the issue).

Under *Iqbal*, the allegation in the second amended complaint that Bette Osborne "knew that [DSS] employees are routinely entering people's homes and conducting searches" does not, without more, support a claim for supervisory liability. *Iqbal* expressly rejected as a basis for liability government officials' "knowledge and acquiescence in" their subordinates' unconstitutional conduct, because such liability would amount to holding the officials "accountable for the misdeeds of their agents." *Id*. at 677. Plaintiffs allege more than knowledge and acquiescence, however. They allege that, while knowing of the unconstitutional conduct of her subordinates, Bette Osborne failed to establish proper training policies concerning constitutional rights and established a policy or "protocol" pursuant to which DSS employees "were allowed to enter anybody's home without a search warrant or court order and without care for protestations of privacy and objections to searches, and do whatever they like." If proven, such allegations would amount to a showing that, through her own individual actions in carrying out her responsibilities as DSS Commissioner, Bette Osborne caused the constitutional violations of which plaintiffs complain. Imposing liability based on such a showing would be consistent with *Iqbal*, *id.* at 676, and would satisfy *Colon's* third category, *i.e.*, that Bette Osborne "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such policy or custom."[3] 58 F.3d at 873.

_____

[3] The effect of *Iqbal* on "policy or custom" claims under the third *Colon* category is unsettled. The Court agrees with the district court in *Bellamy v. Mount Vernon Hosp.*, 2009 WL 1835939, *6 (S.D.N.Y. Jun. 26, 2009), *aff'd* 387 Fed.Appx. 55 (2d Cir. 2010), that the third category "pass[es] *Iqbal's* muster" to the extent that the supervisor may be held liable if he or she creates a policy or custom under which unconstitutional practices occurred. Whether the reasoning in *Iqbal* also allows for liability where the supervisor "allowed the continuance of such policy or custom" in the type of situation presented by

Plaintiffs have presented sufficient evidence to create a question of fact and withstand summary judgment on the claim that Bette Osborne violated their constitutional rights through her own individual actions in establishing and continuing an unconstitutional policy or custom. According to plaintiffs, Deb Munyan, Linda Smith, Crystal Cornell, and Lace-Ann Porter told them that DSS "protocol" authorized them to conduct searches without consent, a court order, or a warrant. Dara Argro also testified that Lace-Ann Porter stated: "I love my government job, because ... I have no responsibility to the general public or accountability." Moreover, plaintiffs allege repeated violations of similar nature committed by a number of different DSS caseworkers. Summary judgment dismissing the sixth cause of action as to defendant Bette Osborne in her individual capacity is denied.

The claim against Bette Osborne in her official capacity is a claim against the County. "[A] municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

_____

the instant case is less clear. *Compare Bellamy,* 2009 WL 1835939 at *6 ("[A] supervisor is <u>only</u> held liable ... if that supervisor <u>creates</u> a policy or custom under which unconstitutional practices occurred." (emphasis added)), *with Butler v. Suffolk County*, 289 F.R.D. 80, 94 (E.D.N.Y. 2013) (stating that a supervisory official can be held liable if he created a policy or custom under which the unconstitutional practices occurred, <u>or allowed the continuance</u> of such a policy or custom); *also see discussion in Doe v. New York*, 2015 WL 1221495, *5 (E.D.N.Y. Mar. 16, 2015). This Court is inclined to view the entire third category in *Colon* as proper under *Iqbal's* reasoning; liability for allowing the continuance of an unconstitutional department-wide policy or custom amounts to liability for the supervisor's own misconduct, not merely for the misdeeds of the supervisor's agents. *See Iqbal*, 556 U.S. at 677. Likewise, in circumstances such as those presented here, providing improper training which authorizes unconstitutional conduct would seem to amount to misconduct by the supervisor. In any event, because the question of whether or to what extent *Iqbal* affects *Colon* with respect to the third category is unresolved, the Court treats the entire third category of *Colon* as good law.

may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694; *accord Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) ("[T]he court must determine whether that official had final policymaking authority in the particular area involved."). Defendants do not deny that, as County DSS Commissioner, Bette Osborne is the official with final policymaking authority in the particular area of social services in the County. Therefore, summary judgment dismissing the sixth cause of action as to Bette Osborne in her official capacity is also denied.

Qualified Immunity

Defendants also argue that they are entitled to summary judgment on the ground that their actions were protected by qualified immunity. Government officials performing discretionary functions enjoy a qualified immunity shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

Defendants here contend that, accepting their version of events, their conduct was proper. If the jury accepts plaintiffs' version of events, however, defendants could not reasonably have believed that their conduct was consistent with plaintiffs' rights. Indeed, neither defendants nor their expert, Margaret A. Burk, Esq. assert that, if plaintiffs' allegations are true, defendants could reasonably have believed that the actions complained of did not violate plaintiffs' rights. Accordingly, summary judgment on the ground of qualified immunity is denied.

Sealed Documents

Finally, the Court addresses plaintiffs' motion (Dkt. No. 65) for leave to show certain materials filed under seal (Dkt. No. 64-2) to her clients and an unspecified non-party. In view of

the grounds upon which the Court decides the summary judgment motions, these documents are not relevant to the Court's determinations herein. Even if the Court were to consider these documents, they would not result in different rulings, because the record sufficiently raises material questions of fact on the causes of action as to which summary judgment is denied, and the documents do not bear on the reasons for summary judgment dismissing the those causes of action that are dismissed. Thus, there is no prejudice to plaintiffs. If necessary in preparation for trial, plaintiffs' counsel may show the materials to plaintiffs provided that they sign the confidentiality agreement as noted in the letter (Dkt. No. 69) from counsel for the County defendants. As for non-parties, counsel are directed to agree to a solution on a case-by-case basis prior to trial.

Restricted Documents

The Court directs the Clerk of the Court to designate the following documents as "Restricted" because the name of D.T., a child born in 2005, has not been redacted: Dkt. Nos. 57-7, 57-8. Counsel are directed to advise the Court immediately if they notice any other docket entries that should be restricted.

**CONCLUSION**

It is therefore

ORDERED that the motion for summary judgment (Dkt. No. 57) by Detective Marsh is granted in its entirety with prejudice; and it is further

ORDERED that the motion by the County defendants for summary judgment (Dkt. No. 64) is granted in part and denied in part as follows:

- The First Cause of Action may proceed solely on the Fourth Amendment claims by Myrna Horshinski and Cody Bess against Chenango County, Linda

Smith, and Deb Munyan;

- The Second Cause of Action may proceed solely on the Fourth Amendment claims by Myrna Horshinski and Cody Bess against Jessica Szarmach (incorrectly sued as Jessica Smarsmach); and the claims against the "John Doe" defendant are dismissed without prejudice;

- The Third Cause of Action may proceed solely on all three plaintiffs' Fourth Amendment claims against Crystal Cornell and Lace-Ann Porter, and on Dara Argro's Fourteenth Amendment Substantive Due Process Claim against Lace-Ann Porter;

- The Fourth Cause of Action is dismissed in its entirety without prejudice;

- The Fifth Cause of Action is dismissed in its entirety with prejudice; and

- The Sixth Cause of Action may proceed on behalf of all plaintiffs against Bette Osborne in her individual and official capacity; and

- All other claims are dismissed with prejudice;

and it is further

ORDERED that defendants Detective Marsh, Kathy LaVoie, Kelly O'Connor, and all "Doe" defendants are dismissed from the case; and it is further

ORDERED that the motion by plaintiffs (Dkt. No. 65) regarding discovery materials is granted to the extent set forth herein; and it is further

ORDERED that the Court directs the Clerk of the Court to designate the following documents as "Restricted" because the name of D.T., a child born in or about 2005, has not been redacted: Dkt. Nos. 57-7, 57-8; and counsel shall advise the Court immediately if they notice any other docket entries that should be restricted; and it is further

ORDERED that the case is trial-ready, and the Court will notify the parties of a trial date.

IT IS SO ORDERED.

DATED:  March 30, 2015
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge